IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. TDC-22-180 |
| ANTIONE WILLIAM TUCKSON | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### REPLY IN SUPPORT OF MOTION TO REOPEN DETENTION HEARING

On September 9, 2022, Antione Tuckson filed a motion to reopen his detention hearing and for pretrial release. ECF No. 32. The government filed a response in opposition on September 27, 2022. ECF No. 33. In its response, the government argues that there is no basis to reopen Mr. Tuckson's detention hearing because, it asserts, at his initial detention hearing Mr. Tuckson (1) should have proposed Ms. Shakirah Keel as a third-party custodian; (2) should have cited news reports that had not yet been published; and (3) should have anticipated that he would be relocated to a state detention facility in Virginia. It further contends that Mr. Tuckson should not be released temporarily because he is at "relatively low-risk for COVID-19," despite his hypertension, and because his detention at Central Virginia Regional Jail (CVRJ) does not impede his ability to prepare his defense. The government's arguments fail on all counts.

As explained in his motion to reopen his detention hearing and below, circumstances have changed since Mr. Tuckson's initial appearance and detention hearing which ameliorate any remaining concerns that Mr. Tuckson would pose a danger upon release. Mr. Tuckson respectfully requests that the Court reopen his detention hearing and grant him pretrial release, or release him temporarily in the alternative.

1

## I. Changes in Mr. Tuckson's Circumstances Materially Bear on Whether Conditions Can Be Fashioned for Release.

The government's contention that Mr. Tuckson has not provided a sufficient basis for reopening his detention hearing because he should have anticipated the myriad change in circumstances that have occurred since his initial hearing falls flat. First, at the time of Mr. Tuckson's same-day initial appearance and detention hearing, Ms. Keel had not yet been qualified by U.S. Pretrial Services as a suitable third-party custodian. Although Mr. Tuckson has a large extended family who continues to support him, many family members were unable to serve as third-party custodians due to housing limitations, personal obligations, or conflicting work schedules, or were unsuitable for other reasons. Mr. Tuckson was not aware that Ms. Keel would be available to serve as a third-party custodian at the time of his initial hearing, nor was she approved by Pretrial until months later. *See United States v. Gallagher*, Crim. No. SAG-19-479, 2020 WL 2512418, at *2 (D. Md. May 15, 2020) (reopening detention based on COVID-19 and releasing defendant to third-party custodians who were proposed at initial detention hearing but who had not been vetted by Pretrial Services at that time); *United States v. Robinson*, Case No. 20-cr-0008-GLR-1, 2020 WL 1820089, at *2 (D. Md. April 11, 2020) (granting motion to reopen detention hearing because proposed third-party custodian's work schedule had changed but denying release).

As U.S. Pretrial Services has found, Ms. Keel is a suitable third-party custodian. The government's suggestion that Ms. Keel was aware of Mr. Tuckson's alleged conduct or was duped by it is unsupported by both fact and common sense. Mr. Tuckson did not reside with his sister-in-law; Ms. Keel lives in Hagerstown, Maryland, nearly three hours from Mr. Tuckson's residence. There is no evidence suggesting she had any knowledge of his alleged conduct, nor is there any

2

reason to believe that she should have any knowledge of the alleged conduct. Ms. Keel is a responsible parent and working professional who is well-prepared to provide oversight as an attentive custodian. Furthermore, her work schedule allows her to be home in the afternoons, evenings, and weekends, when there is often the greatest risk that a violation may occur.

      Mr. Tuckson also would be subject to home detention and electronic location monitoring, which further assures the safety of the community. Although the government argues that this is insufficient because Mr. Tuckson could theoretically "use unrecorded telephones or other devices to resume his criminal activity" and would pose "a serious danger to Ms. Keel" and others in the home, neither assertion is supported by the evidence. The government's case centers on Mr. Tuckson posing as a deputy U.S. Marshal in the community—not via electronic devices. And Mr. Tuckson has never been convicted of, or even charged with, a violent crime and there is no basis to suggest that he would pose any danger to his family members. The combination of 24/7 home detention, electronic location monitoring, and the vigilant oversight by U.S. Pretrial Services and Ms. Keel at her home in Hagerstown reasonably assure the safety of others such that release is warranted.

      This is particularly true given the fact that Mr. Tuckson no longer has the means to engage in impersonation. Contrary to the government's contention that Mr. Tuckson poses a danger because he could "easily" create a fake identification card, all tools allegedly used by Mr. Tuckson, including a printer and identification cards, have now been seized by the government. There is no evidence that Mr. Tuckson stored belongings at any location other than his residence, which has now been thoroughly searched. Mr. Tuckson is also now well-known, including to the U.S. Marshals Service and other law enforcement personnel. This case has been publicized in national news reports that reached Mr. Tuckson's acquaintances and former employers across the country.

The government's suggestion that there is no basis to reopen the detention hearing because Mr. Tuckson should have anticipated the breadth of media coverage of his case is specious. First, not every case that comes before the Court receives national attention. Second, Mr. Tuckson had already been charged in state court for related conduct nearly three months prior, yet his alleged conduct did not engender significant media attention at that time. Mr. Tuckson's case was not reported by the Washington Post, NBC News, and other national news providers until after his detention hearing in federal court.

Finally, Mr. Tuckson's transfer to the Central Virginia Regional Jail could not have been anticipated at the time of his detention hearing and does materially bear on the Bail Reform Act factors, particularly Mr. Tuckson's "physical and mental condition." 18 U.S.C. § 3142(g)(3)(A); *cf. United States v. Davis*, No. 20-cr-0009-ELH, ECF No. 21 at 5 (D. Md. March 30, 2020) (finding that "the COVID-19 public health emergency must be considered when weighing 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release,' and the defendant's 'physical and mental health'"). Mr. Tuckson could not have known that he would be relocated to the detention facility in Virginia. Indeed, the Office of the Public Defender had no notice that detainees were being moved from Chesapeake Detention Facility and were initially advised that only a small number of female detainees were moved. Nor could he have anticipated that he would be transferred to a detention facility at which his ability to socially distance and engage in other precautionary measures would be severely limited, greatly increasing the likelihood that he will be exposed to and become seriously ill from COVID-19.

The Bail Reform Act makes clear that the detention hearing "may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are

conditions of release that will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(f). The identification of a suitable third-party custodian who has been vetted and approved by Pretrial, the widespread media coverage of Mr. Tuckson's case, and Mr. Tuckson's transfer to CVRJ are all factors that were not known at the time of his initial hearing which, in combination, materially bear on the Bail Reform factors under 18 U.S.C. § 3142(g). The Court explicitly noted at Mr. Tuckson's initial appearance and detention hearing that the issue of detention may be revisited. He asks the Court to do so at this time.

### II. Alternatively, the Court Should Temporarily Release Mr. Tuckson.

In the alternative, Mr. Tuckson asks that he be released temporarily pursuant to 18 U.S.C. § 3142(i) on the basis that detention at Central Virginia Regional Jail poses to a risk his health and impedes his ability to prepare his defense. Congress specifically provided that temporary release may be granted if the Court determines that "such release [is] necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Discovery in this case is ongoing, and can only be reviewed in person. Although video conferences are ostensibly available, the audio connection is poor and often makes communicating impossible. Unmonitored legal calls remain unavailable. Mr. Tuckson will be far better able to confer with counsel and prepare his defense upon his release to Ms. Keel's custody.[1]

The risk to Mr. Tuckson's health that detention at Central Virginia Regional Jail poses further supports his request for temporary release. Mr. Tuckson has been diagnosed with hypertension and takes medication daily to manage his symptoms. Ex. 1 at 1. Further, it appears

---

[1] The government suggested that the U.S. Marshals Service can relocate Mr. Tuckson to a closer facility. Mr. Tuckson welcomes the government's assistance in facilitating his relocation by the U.S. Marshal Service while he is detained.

his health may be worsening. Last month, he developed swelling in both of his ankles and needed to be prescribed anti-embolism compression socks. *Id.* at 1–2. He reports that he is still experiencing uncomfortable swelling in both of his lower legs.

The government's assertion that Mr. Tuckson's hypertension does not place him at increased risk for serious complication for COVID-19 is simply untrue. According to a recent study by researchers at Cedars-Sinai, hypertension alone doubles the risk of hospitalization, even in individuals who are fully vaccinated and boosted.[2] *See also United States v. Benson*, No. 09-cr-240-PWG, 2020 WL 7239983, at *3 (D. Md. Dec. 9, 2020) ("Hypertension alone has qualified as an extraordinary and compelling circumstance sufficient to justify compassionate release."). Mr. Tuckson is also unvaccinated based on a religious exemption, which further increases his risk for severe illness from COVID-19.

Mr. Tuckson is now being detained in an environment where he is unable to take appropriate social distancing measures to limit his exposure to this potentially life-threatening virus. Unlike at Chesapeake Detention Facility where detainees typically share a cell with one other individual, Mr. Tuckson now sleeps in an open dorm with dozens of detainees. Detainees are discouraged from seeking appropriate medical care due to CVRJ's fee system, and Mr. Tuckson's mask was confiscated. While the facility does not currently have any active COVID-19 cases, that could quickly change given its lack of preventative measures. The Court should order Mr. Tuckson to be released temporarily to his sister-in-law's custody, both so he can protect himself from COVID-19 and so he can prepare adequately his defense.

---

[2] Joseph Ebinger, et. al, "Hypertension and Excess Risk for Severe COVID-19 Illness Despite Booster Vaccination," *Hypertension* (Oct. 2022 preprint), *preprint available at* https://www.ahajournals.org/doi/epdf/10.1161/HYPERTENSIONAHA.122.19694.

## III. Conclusion

For the foregoing reasons, Mr. Tuckson respectfully requests that his detention hearing be reopened and that he be granted pretrial release. In the alternative, he requests that he be temporarily released pursuant to 18 U.S.C. § 3142(i).

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

/s/
_____
Meghan Michael (# 811137)
Assistant Federal Public Defender
100 S. Charles St., Tower II, Ninth Fl.
Baltimore, MD 21201
(410) 962-3962 (p)
(410) 962-3976 (f)
Email: meghan_michael@fd.org